You know, we, just so everybody's aware, we set this case, and it noted, you know, standard timing, but we're well aware that we've got three separate appellants, each of whom dealing with a life sentence, and we're, you know, we're not sticking to that time frame, we're going to take the time that needs to address the issues that have been raised. We'll begin with Kit Al Savage's appeal. Good morning, Your Honor. So I have, at least as it was divided, six minutes, so I reserve one for rebuttal. Well, you can, like I said, why don't you take it as given that we'll give each of you 15 minutes for your client's appeal, and we'll ratchet back from there. So if you want to change your idea about what you want to reserve, go ahead. I'll reserve two minutes then. Okay. I've heard a lot by that point. So may it please the Court. Justice must satisfy the appearance of justice. Those words from the Supreme Court's decision in Offit v. United States are quoted at page five of our reply brief, but they're also quoted in the Supreme Court's later decision, which I discovered in preparing for our argument, Latecky v. United States, 510 U.S., at 565, in support of this statement. In matters of ethics, appearance and reality often converge as one. Okay. Now, because we know this case, right? And we know the feelings everybody's got about it, I think. So let's figure this. I take it you're leading into your conflict of interest argument here. Can you answer us to start with whether or not the actual – why doesn't the actual conflict of interest standard apply here? Especially in light of – you saw in the government's supplemental authority they cited to our Simon v. Governor of Virgin Islands case. In light of Simon, why aren't we bound to look at this from an actual conflict of interest perspective? I think there was an actual conflict of interest. So are you agreeing that that's the standard? Yes. Okay, good. What was the conflict of interest? So the conflict of interest is that the prior attorney had prosecuted, albeit for what appears to be a short period of time, though no one really knows because Mr. Phillips didn't remember, but for a short period of time, one of the underlying RICO predicate murders that was being defended against in this particular prosecution. Mr. Berman, you referred to the apparent brevity of the representation, which was at the time the attorney was an assisted DA within the Philly District Office, right? Correct. Irrespective of any recollection of just how long it was, you indicate apparent agreement among people that it was a short period of time. Did the record that was developed in this kind of collateral proceeding that was conducted during the course of trial develop any specifics as to what counsel did with respect to the case that was assigned to him or on which he had his fingerprints or whatever it was? And the answer is no. We don't know what he did. Correct, because he did not remember. Well, in his recollection, when you say he didn't remember, he didn't even remember it happened. Correct. So if he had no recollection of it whatsoever, and there's no record of what he did, how can there be an actual – and the best indication we have is it was a matter of a few days before it moved off of his desk. And just to follow up, he never appeared in court on behalf of defendants. He didn't remember appearing in court.  A court appearance is going to show somewhere in record, so you don't necessarily need the counsel's recollection on that. That could be developed to other evidentiary sources, right? I don't think it was. Well, on the record in this proceeding. Correct. So – and that's why I feel the pushback. But the sum and substance of the record created at the evidentiary hearing, which the other part of the argument is that it happened too late anyway, is that he didn't remember at all. So it may be that he didn't appear in court, but there was no evidence to indicate that he appeared or didn't appear. He didn't remember. Hold on just a second, Sperm. We need to fix the clock because we didn't change that, right? Right. Yeah. Give him 15 minutes, knock two minutes off, and I think we've already spent like maybe five of that. So if we're on an actual conflict standard, don't you have to also show that this conflict adversely affected Mr. Phillips' performance? I don't think so. Simon says – sorry about that. I like that. Yeah. It adversely affected the lawyer's performance. That's a quote. It gives three things that you have to show. You have to show that there was multiple representation, second, that there was an actual conflict, third, that it adversely affected the lawyer's performance. So we give you one and two for purposes of argument, and we look at number three. Where is there in the record any place that you point us to where we can say, oh, my gosh, competent counsel would have done X and he didn't? It must be because of a conflict. Right. So we've cited the case law for the proposition that a particular case like this where the inquiry happens too late, where the court's inquiry happens too late, that it's too much of a burden to impose on a defendant to point to the type of particular decision that Your Honors is talking about. Well, we're bound by the Simon case, which is why I started at the beginning by asking, do you agree that there's an actual conflict of interest standard that we have to apply here? This is our actual conflict of interest standard. Simon v. Government of the Virgin Islands articulates it. So you may feel it's not a fair burden, but it's the burden that this court's applied, and it's incumbent on you, isn't it, to show us this is where Phillips fell down on the job. So – and I guess I'm not being clear enough. So what I'm saying is that the prejudice to – I can't point to any particular decision – I can't point to the record and say that Phillips should have done X, Y, or Z. What I can point to is the fact of the way this was handled and the impact it would have on a defendant. So the issue was raised, and there was no attempt to educate the client about the significance of it. There was no waiver from the client. What the record is is that Mr. Phillips told Ms. Savage, don't talk to me about this, talk to Ms. Whelan, and he continued on. Because at a certain point about this, at a certain point, this idea of a conflict gets raised, and everybody has to deal with it. So it would seem pretty natural he would do something like that. That's why I'm trying to get you to focus back on where's the prejudice to her? Are you saying that the prejudice is she didn't get to talk to her lawyer about the conflict that she says was conflicting him? So that – yes, that is what I'm saying. I'm saying that in the middle of a trial where she's on trial for multiple mandatory life sentences, all of a sudden one of her attorneys is – Is not able to talk to her about the conflict she says he's under. Correct. And how does that affect her? How does that affect his representation of her in the courtroom on the charges she's facing? So I cannot point to any specific thing in the record other than it affects what then happens for the rest of the trial. With that big hole in the record and in your case here, what are we to do? Well, respectfully, what I think the court should do is reverse because none of this happened. The inquiry that was required – let me approach it this way. I'm answering Your Honor's question. I'm not ignoring it. If this had arisen before trial, it would have been – the court would have inquired of the defendant, would have explained to her the problem, would have elicited either a knowing involuntary waiver or not, and if not, would have appointed a new attorney. That's what needed to happen immediately. And she had a lawyer. I'm sorry. She had Whelan, right? So she suggests that Whelan was under conflict. Well, no, but here's the thing. There's two things about that. One is – so here I was trying to think of an analogy, right? If someone is – and it's, you know, little apples and oranges – but if someone has two financial advisors, one of whom is doing a fine job and one of whom is stealing from him, one is still the victim of having insufficient financial advice. Now, there's no legal – well, maybe a legal – no constitutional right to financial advisors, but there is a constitutional right to having attorneys who are not conflicted. And here's what I actually think is the harder situation. If Mr. Phillips had dropped out of the case at that point and then Your Honor said to me, well, Ms. Whelan continued, I'd have a difficult argument to make because the wound would have been cauterized. Her presence in the courtroom was prejudicial to her. At the end of the day, that's the position you're taking? My position is that his continuing as part of the defense team, even though he's been alienated from his client because of this conflict, which was unaddressed both by a defense counsel – which, actually, I'd like to address that particular issue – but also by the court, she was forced to proceed with this cloud for the rest of her trial. He was the lead counsel. Whelan was the lead counsel. This representation was, as I understand it, for a very short period of time. Mr. Phillips. Ten days, yeah. Don't you have to establish that but for the conflict that you assert occurred, the result of the proceedings would have been different? I don't think so. Well, I think the defendant has – In other words, you're saying that the conflict did indeed affect the proceedings as going forward. I believe it did because her lead attorney was no longer capable of – We need something more than your belief. We need to find something in the record that supports this case somehow turning in a different direction than it did, that demonstrates some deficiency. As I said, I – And you virtually admitted that we don't have that here. Notwithstanding the fact that Judge Surek took the time to conduct this collateral but highly relevant proceeding in an attempt to ferret out what happened. So what I would say is Judge Surek did not satisfy what was required of the court. The court waited until after the case was over to address an issue that should have been addressed immediately, and the Supreme Court precedent requires it to be addressed immediately. That's not exactly right. He didn't wait until the end. I mean, he took steps immediately. He appointed counsel, conflict counsel, for your client. He appointed a counsel to assist and represent Mr. Phillips' interests. He gave the parties an opportunity to look into it and try to ferret out what the facts were so that there would be some kind of a record. This happened six weeks into a four-month trial, a multi-defendant complex case, which you're – you know, we're all aware of the complexities of a RICO case like this. So I mean, it doesn't seem really fair to say he waited until after the trial. He took steps, and it wasn't finally resolved until after the trial. That is a – that's a correct statement. But you have relied in your reply brief on Holloway v. Arkansas as authority for your position that this wasn't timely addressed. I just want you to help me out with that because that case, like, even as you quote it, it says that the point is – where is this here? It's on page two, I think, of your brief, your reply brief. It says that it's appropriate to reverse a conviction when, quote, close quote, to determine the existence of a conflict of interest. What was inadequate about what the judge did here? And in answering that, please answer this as well, if you don't mind me giving you a compound question. By the mere use of the words adequate steps, isn't the Supreme Court indicating that we're looking at this from an abuse of discretion perspective? So there's a lot there, so I'll try to answer all of it. So as I was listening to Your Honor listing the steps that the district court judge took to address the conflict, I'm actually hearing the absurdity of it. In the middle of a trial, the defendant – the judge appointed an attorney to represent the defendant's own lawyer in a proceeding that the lawyer ended up being adverse to their own client that they were still purportedly continuing to represent. How is that not a conflict? It's not always the case that there's an adversity, right? If what you're saying were true, Mr. Berman, that any defendant could derail any case by saying, I have a conflict and here's what's come to be my attention, everything must stop now. It doesn't matter how many other defendants there are. It doesn't matter how far into the process we are. Everything has to stop right now. Now, if we're on an abuse of discretion standard, so maybe we should start with the standard of review, it can't be the case that everything has to stop ipso facto. Doesn't it have to be context specific? So context always matters, so I don't want to say it doesn't have to be context specific. But I don't believe in this instance the standard is abuse of discretion. On page three of our reply brief, in the sites after, it's clear where the district court fails to make an inquiry, a timely inquiry, that the person… It's untimely. You just put the rabbit in the hat with the word timely. No, I don't mean to put the rabbit in the hat, but that's my argument, which is an after-trial inquiry is not a timely inquiry. I have the sense we're not getting anywhere with this. We've identified the fact that the issue has been raised, that the trial judge conducted a proceeding in the course of trial, that that proceeding developed no evidentiary matter that is suggestive even of the extent to which defense counsel had been involved when he was in the DA's office with this case. We have nothing that you have pointed to that suggests that the conflict that we will assume existed affected performance during the course of trial. What further is there to argue or to discuss here? So I respectfully disagree with that characterization of the… Please tell me what you disagree with. I'm happy to amend it. Right, so I think a hearing after the case is over is not a timely inquiry. Well, we've already established, you've already said that at least once. Well, I'm responding to Your Honor's characterization. No, I didn't use the word timely. I said in the course of trial, he conducted this collateral… But the court didn't conduct a hearing during the course of trial. The trial was over by the time the court conducted a hearing. That's accurate. What I'm saying is accurate. I understand. I understand. It was raised during that time. It was addressed. It was raised and he didn't finally resolve it during the course of trial. I'm sorry. I didn't finally resolve the matter until the course of trial and conducted the proceeding then, right? He didn't hold a hearing until after the trial was over. That's an accurate statement of what happened. Well, maybe with what time we've got left, we could shift for a minute to the, if my colleagues will permit me, to the question about the admission of statements, the jailhouse statements. Yeah. So we've listed in our initial brief, I think several pages worth of recordings that were played, statements by Caboni Savage to people. They're horrifying. We did it. So those statements were, those comments were horrific. Absolutely. And they weren't admissible against Cadet Savage. They were not statements to co-conspirators. We've listed the identities of the people to whom those statements were made. I take the government's argument to be, and this is what I'd like you to respond to, and they'll speak for themselves, but I think I understand their argument to be these were admitted against Cabani Savage. She's in the room, but these were admitted against Cabani Savage. At the end of the case, the court gives an explicit instruction and limits it and says you heard some terrible things. Those are to be used by you specifically to understand the intent of the speaker and not for any other purpose. So what's wrong with that line of argument? I understand you're saying, and I went back and I read the transcript. I understand you could certainly say that the assistant U.S. attorney on the scene was saying these are co-conspirator statements, right? But that's not what the judge said. On the contrary, at the end of it, the judge seemed to be telling pretty clearly the jury limited purpose against that defendant. Why wouldn't we look at it that way? What's wrong with the government's argument? Okay. So first of all, there was a request that that type of instruction be given at the time the jury was hearing the evidence to mitigate its effect against the other defendants, and that instruction was appropriate and should have been given. But it was given at the end, right? I don't think so. I don't think it was given at that point. I can read it to you if you want. But I don't think what was given – there was an instruction that co-conspirator statements are admissible against all the co-conspirators. So there was no – the jury was never informed how to distinguish among these very statements. And there's a legal fiction that the – I'm sorry, Your Honor. Maybe I'm not following you, but I understand that the jury was clearly instructed as to what constitutes co-conspirator statements. The jury was given a standard co-conspirator statement charge. And what they weren't told – what wasn't explained to them, the importance of a limiting instruction at the time a particular statement is coming in, particularly the types of statements we're talking about in this case, which were so horrific, is so that the jury then understands when it gets a final instruction. It would likely have been better if the judge meant for that for it to happen at the time. But right now we're talking about reversible error. That's what your argument says. So it would have been better then, but if it's ultimately given, are we in the land of reversible error? Yes. Because why? Because I have one, two, three, three-plus pages' worth of instances during the course of this trial of specific instances where statement after statement after statement was presented to this jury without a limiting instruction so that they would have had no idea when it got to the final charge weeks, perhaps months later, as to which statement those charges were applying to. But when you say they would have had no idea here, I will read you from page 15-122 of the appendix. Quote, now during the course of the trial you heard tape recordings of things that certain defendants said. Some of these things, ladies and gentlemen, have included foul or offensive language or included disturbing statements. Ladies and gentlemen, this evidence was admitted for limited purposes. You may consider this evidence only for the purpose of deciding whether the defendant, meaning the speaker, had the state of mind, knowledge, or intent necessary to commit the crimes charged, et cetera. Now, why isn't that? I mean, we can all go back and say you should have said this or you should have said that and you should have said it then, but why isn't that good enough to say to the jury you heard some terrible things? They know what they heard and we've all agreed this is terrible stuff. Why wouldn't that just take their mind immediately to, holy smokes, this is the stuff Kabbadi Savage was saying in jail. And him saying to them, this is a limited purpose, you can't use it against him for a state of mind. And the answer is, in this case, as in the cases we've cited in support of this proposition, there was just too much of it. There was too much of it for the stranger to watch. And there is no case law, certainly from this court or any place else that I know of, that suggests that such a limited construction must be given coincident with the admission of these statements or coincident with and repeatedly after numerous such statements, correct? I don't know if there, the answer is I don't know. But I know that there are, I don't recall, but I do know that there, and it typically arises in the cases of child pornography because child pornography is so horrific, and we've cited the Cunningham case, where it's the same sort of issue, where the evidence is so horrific and the government piles on and piles on without a proper instruction. What we're in is the land of discretion. I'm not sure this ruling would absolutely be a discretion, but in this instance it's of use of discretion because of the arguments we set forth.  Thank you. Great. Let's next hear from Ms. Lynn on behalf of Mr. Merritt. If I'm getting 15 minutes, can I reserve two minutes for rebuttal? You are getting 15 minutes, and yes, you can have two minutes. Good morning, Your Honors. May it please the Court. My name is Susan Lynn. I'm here on behalf of Robert Merritt. I would actually like to address solely today the Apprendi issue, and I rest on the brief with regards to the other issues that were raised. With regards, if that's okay with the Court. With regards to the Apprendi issue, both parties have agreed that Mr. Merritt, for him to be sentenced to anything above 20 years, the jury had to find that his RICO conspiracy conviction was based on a qualifying predicate racketeering activity. Right. So it goes straight to the government's argument that they make on page 388 of their combined brief, right? That's where they get into it and they say, he didn't use the words based on, but a sensible jury would understand that's what's happening because of the form, the way the verdict form is set up and the way they were instructed. What's wrong with that pitch? Because there's nothing actually in the language of the verdict form saying the jury had to find that the RICO conspiracy, that one of the predicate acts that they thought Mr. Merritt had in his head when he joined that RICO conspiracy, was actually the Coleman House murder. Is this an argument that rests on the distinction semantically and legally between based on and as to and which is appropriate? So based on is the language in the statute. I understand that. I understand that. I do think that based on has a different meaning and definition even in regular language than as to. I mean, we know that the Supreme Court in Barrage talked about based on and what it meant. They went so far as to say that based on equals a but for cause. I'm not saying that here, but I am saying that the predicate offense that the jury found as the basis of Mr. Merritt's conspiracy conviction had to have been the Coleman House murder in order for the statute, the sentencing enhancement to apply. They were never instructed on that. Well, how could the jury's verdict make sense otherwise? Are you really making an argument that the jury verdict is inconsistent? Because that's not what you said. But if they find him guilty of a RICO conspiracy and they find him guilty of the murders, and they do, then how can that not be the case that they have said, okay, because there's nothing else in this case that ties him to the RICO conspiracy? The drugs. What? There was evidence that he participated in drug sale activity on Jerome Street, on 8th and Venango, the corners, and the government argued that his participation in this enterprise was based on these drug sales. And the jury found, when they found him not guilty of counts 9 through 16, that Mr. Merritt's participation in the Coleman House murders was not in furtherance of the RICO conspiracy and not for the purposes of witness retaliation. That's interesting because I thought, I'm sorry, go ahead. I was going to say that the jury did find special sentencing factors against Merritt for murder, firebombing, even if they didn't find him guilty of other offenses. So they clearly understood. But they found him guilty of committing it, of participating it. They didn't make the connection between the fact of participating in the Coleman House murders and the RICO conspiracy itself. So you think they just thought, oh, those murders are something out there separate. Within your appellate briefing, over and over again, yours, I mean, attributing it to you, but counsel's appellate briefing, it said repeatedly Merritt never shows up. In fact, a decade later, Coleman even mentions him. In the hundreds and hundreds of hours of taping, Merritt's name doesn't come up. The FBI had never even heard of this guy. To say he was on the periphery is an overstatement. I mean, the import of the briefing seems to be he wasn't involved at all. And yet the jury found him guilty of the conspiracy, and the only acts they found him guilty of, they didn't find him guilty on the special sentencing factors. They said not proven as to drug stuff. They said proven as to murders. So what are we to make of that? For the drug stuff, they could have found him not guilty of the special factor on the drug stuff because he didn't meet the quantity, right? That was clearly about quantity. There is plenty of evidence, and indeed he pled guilty to selling drugs in the exact corners that were controlled by Lamont Lewis, his cousin, and by the Kabani Savage organization. And I cannot emphasize enough the fact the jury found him not guilty of witness retaliation in committing the Coleman House murders. And that's the only connection of the Coleman House murders to the Kabani Savage enterprise. We'll be asking Mr. Johnson or his colleague about that. I'm glad you're going to give me a hard time. But for now, I would like you to respond to their argument that we're here on plain error. This is plain error. Maybe if we were here on ordinary review without this plain error screen in it, outcomes might be different. But on plain error, they emphasize repeatedly this is difficult to get. It's got to be something that brings the system into disrepute. A guy getting a life sentence for participating in firebombing a family and incinerating children, that's not going to upset the public if they think he's got a life sentence. Answer that argument, like the argument that for plain error review, sending a guy away for life for multiple horrific murders is not something that amounts to plain error, particularly when the argument is the words based on weren't on the verdict sheet. So I don't want to minimize the importance of the words based on, given that they're in the statute, and that there has to be a connection between the predicates. Okay, so it is not about whether or not this guy deserved this sentence. It's about whether or not there was fairness and integrity in the judicial proceedings. And if somebody was sentenced in a manner that's inconsistent with what the jury actually found beyond a reasonable doubt, then that completely impacts the fairness and integrity of the judicial proceedings. So the jury could have found that he committed, that he participated in the RICO conspiracy based on his drug activity, and they could also have found that his participation in the Coleman House bombings were based simply on his cousin coming to him hours before it happened saying, yo, help me out with this, because they had previously together committed an arson for the basis of insurance fraud. But the jury clearly found him guilty of murder in a firebombing. Yes, they did. You don't dispute that? I do not dispute that. The question is whether or not the jury thought that Mr. Merritt participated in the firebombing with the intent of furthering or helping out the RICO conspiracy or the RICO enterprise. But if I understand Judge Jordan's last question, which went to plain error review, which is where we are, it was how, given all the circumstances of this case, how the semantic difference between the words, as to and based on, could somehow bring this court, or the decision of this court, into the kind of public disrepute that is required under the plain error standard. How did you overcome that? What we have here is we have sort of a nonsensical result. This is a guy who was acquitted of the vast majority of the charges against him, counts 9 through 16, convicted of only one conspiracy, and yet he has received the same sentence as co-defendants, who were convicted of far more substantive offenses. They all got life. There has to be some sort of explanation for that. If the jury did not find that he committed the murders in connection with, or that the RICO conspiracy wasn't based on them, then the statutory max here is 20 years. Now, I am not saying that 20 years is a short sentence, but the judge, the district court judge, if he were to re-sentence based on 20 years, certainly would be able to impose that sentence consecutive to the 190-something month sentence that Mr. Merritt is already serving based on a gun possession that was one of the overt actions. Could he also sentence him to 20 years consecutively for each of the deaths that he caused? I don't think he could because there was only one count of conspiracy charge that he was convicted of. So he couldn't do that because, as to each of the separate counts, he was found not guilty, right? I mean, each murder was also on the special interrogatory sheet listed separately. But I don't think the special interrogatory, that those factors create a different count of conviction. There's one count of conviction here, which I submit should be a 20-year max, because otherwise it would be an apprendee violation. The judges, of course, are very respectful to jury decisions. In this case, the jury found special sentencing factors against Merritt for murder and firebombing. I would actually rely on what I thought Mr. Stiegler did in the brief, which was a very interesting and good analogy. If this was some sort of sentencing guidelines case, and it was a felon in possession charge, and the special factor was jury on count one, we find him guilty of possession of firearms. Special factor is he previously had a conviction for a felony. That's the analogy that Mr. Stiegler described in the brief, and I think that that's appropriate here, because one can have a special fact that the jury has to find without assuming that the jury thinks that there's some sort of based-on relationship between the count and the special fact that was found. Does it matter what the jury was instructed in this regard, whether they made that connection? The phrase, with regards to, I think those were the exact words, I think, that Judge Sirak used? Yes. There are, with regard to the conspiracy count, a series of sentencing factors we ask you to consider. They're told, when they're given the verdict sheet, these special factors are with regard to the conspiracy count. Does that matter? The phrase based-on and with regard to have different meanings. Plain language, they're different meanings. Help us out. What is so different between with regard to and based-on? Based-on means... Do you think the jury didn't get it, that the murders, you know, they're asking me about the conspiracy, and these other things are all about the conspiracy? So based-on means that the jury has assigned, when Mr. Merritt went into that conspiracy, when he joined that conspiracy, that his intent was to further X activity. If the jury found drug trafficking activity, and that was the basis for their conspiracy conviction, then this enhancement does not apply. But the court specifically said, we're going to ask about all these things. They're all in regard to the conspiracy. I don't know that... You don't think, when he says we're going to... There are, with regard to the conspiracy count, a series of sentencing factors. You just acknowledged he was found not guilty of the drug-related stuff. Quantity. Because it's about, quote, quantity. So I guess what it comes down to is, your argument is, it is plain on its face that when the judge told him, with regard to the conspiracy, look at these factors, including the one that they find him guilty of, they, in their mind, thought, well, that may be with regard to, but it's not based on. No, I think, in the jury's mind, they didn't think any of that. They just thought, did he commit the murders? That's it. Not based on, not with regard to. Okay. All right. Well, thanks very much. We'll have you back on rebuttal. Mr. Egan, we'll hear from you with respect to Mr. Northington, and then we'll turn to the government to take you all on at once. Good morning. May it please the Court. It's difficult when you have 12 different homicides that are committed to try and recreate the aura or the tenor that was in the courtroom for various homicides over the course of the month of the trial. However, it was clear that the tension was palpable and the emotions were high when the case was litigated with regard to the firebombing murders, because you had the murders of women, you had the murders of children, you had the murders of a dog, and you had all the different motivations behind those murders. Mr. Northington was not charged with being involved in those murders in any of the indictments handed down by the government. He was not a participant in those murders in any way. Well, when you say he was not a participant in those murders in any way, the jury heard him. In fact, one of the things you complain about is that when he was arrested, he had firebombing material in his car, and it was made pretty clear that he was in the neighborhood of the Coleman's, and he would have been the guy to throw a gas can into their home if he hadn't been arrested. So that was in front of the jury at least, right? It was, although we suggested it shouldn't be in front of the jury, because there was no link between that car stop and what he had in his car and any information that he had obtained or instructions he had obtained to go commit a firebombing. Well, my point in asking the question is, if your argument is leading to the prosecutorial misconduct assertion, the pointing at Mr. Northington during closing argument, there was at least some basis for maybe confusion or an accidental pointing in that he was not totally unrelated to a desire on the part of Kobani Savage to get back at the Coleman's, right? He was familiar with it, and there was at least some evidence that he was prepared to do something about Kobani Savage's request, right? Whether you like that it was in the case or not, it was in the case, it was in front of the jury, right? It was in front of the jury, but with respect to that, I disagree with that factual analysis of what it is that happened. The representations that were made during the litigation of the motion to try and prohibit the introduction of that evidence, and as the evidence shook out during the course of the trial, the representations that were made by the government with regard to what they would be able to prove to try and draw a link between that September car stop and instructions that had been given first hand, second hand, or third hand to Mr. Northington to commit any firebombing, as the trial played out, they didn't exist. The representations that were made by the government were not accurate with regard to that at the time Judge Sarek made his ruling for the admissibility of the evidence. They never linked it up, you're saying? They never linked it up factually at all. So there were bald representations made without testimony during the course of the motion hearing, but then once you got to the trial, none of those panned out. Did you consider earlier that Northington did in fact have firebombing equipment in his vehicle? What Mr. Northington had in his vehicle, he and another passenger were in a vehicle where they had a firearm, they had a gasoline can, and they had some latex gloves. Of course, the police can put all that together and figure out that there's an intent to do some harm somewhere along the way. Well, if I may back up just a little bit. The representation by the government during the motion hearing was that there was a telephone call in June. This is three months before the car stop. September 8, 2004 is the car stop. That's correct. June 20, I believe, of 2003-4 is the time of the telephone call, where somebody named Money Sign is told to get on or get on with it or go do it. Words to that effect. And forgive me, it's been eight years since I litigated all the exact verbiage of this. But that's the representation that was made during the motion argument, that the government would then be able to link Money Sign with being the one who was supposed to get instructions through another person who was on that call, Mr. Wilmore, to then go and commit the bombing of the Coleman residence. Did they never bring out that Mr. Northington's nickname was Dollar Bill? Never. Never brought out that he was Money Sign? They may never have said, he's Money Sign, but you're telling me the jury never heard that his nickname was Dollar Bill? I am saying that that was thrown out there in terms of testimony. It was mentioned, but without any supporting basis. Attributed to Mr. Northington as a nickname? Attributed to Mr. Northington as a nickname. So the jury, in response to Judge Sherman's question, the jury did hear it as a nickname for Mr. Northington. They did hear it with regard to direct examination. Then when it turned out on cross-examination, which was an important aspect of this, there was no link of it. Nobody in the entire organization referred to him in any monetary fashion, is the best way I can put it. Ultimately, the FBI agent who had thrown that word out there on direct examination, on cross-examination, had to concede nobody had ever given that information to him from anybody in the organization or any other source. So it was thrown out as a bold assertion that was completely unsupported once it was tested on cross-examination. But the genie was already out of the bottle because the evidence is already there. The pretrial ruling has been made, and that evidence is coming in. I might have taken you down a path that you didn't intend to or want to go down, Mr. Regan. You started by talking about how this was such inflammatory evidence, the statements that Lonnie Savage was making, I guess, and the evidence of the bombing itself heightened the tension in the courtroom. Where are you going with that? Is this about severance? Where are you going with this? Sure, Judge. Where I'm going with it is, one, with regard to the closing argument made by the government. That would be one aspect of it. But the second is, you'd have to look at the underlying strengths and weaknesses of the cases with which Mr. Northington was actually charged because he's not accused of having been the trigger man in either of those homicides with which he was charged and ultimately convicted by the jury. The first murder is based on evidence presented by a corrupt and polluted source. That's all there is with regard to that evidence. And I'm not saying a jury can't adopt that, but that's what the evidence is. And they did. I understand. End of subject on that, right? No, if I may, the reason why I'm saying that it's important looking at the other evidence that I've discussed with the car stop is because there could be a propensity for the jury just to look at Northington as a bad guy when they're trying to weigh what they want to do with the corrupt and polluted source, when they're trying to weigh what they want to do with the Flowers murder, where he is implicated as having been somehow involved but not the trigger man. So you have to look at the overall picture of the entire trial. I'll reverse it this way, Judge. If the case had been severed like we saw it, then would there have been any reason for the admissibility of that evidence? Because we would have only been litigating the Parker murder. We would have only been litigating the Flowers murder. That evidence would have never come before a fact finder in any capacity if we were only litigating those two murders as a result of a severance. Your severance argument requires us to say the jury was unable to compartmentalize, right? The Inigo case that's been cited to us is the standard, right? It is. Okay. When we look at the verdict sheet, isn't it clear that the jury was indeed able to compartmentalize the evidence because they said as to multiple things, not proven or not guilty for different defendants on this or that. They didn't just say throw them all in for life or give them all death. They didn't say that. They compartmentalized things. They compartmentalized things, including finding not proven with regard to something with Mr. Northington and drug trafficking. However, that's still, in terms of looking at the severance, I'm not, the best way to put it is we have to look at whether there was a relevance to the admissibility of that evidence because it's not intrinsic to anything with which Mr. Northington was charged. So then you go into a 404B analysis as to whether it would be otherwise admissible during the course of the trial. If it wouldn't have been admissible in a severed trial, not dealing with whether severance should have been granted, but if it wouldn't have been admissible in a severed trial, why would it be admissible in the joint trial? Well, when you say it's not intrinsic, you know, the government will speak for itself, but I took their argument to be, oh, no, it is intrinsic. That is, in fact, what Judge Surik found. Judge Surik said this is intrinsic to the RICO conspiracy charge. It shows Northington acting on a direction from Kobani Savage to take revenge on a witness, a witness's family. That's not 404B evidence. That's intrinsic evidence, right? Mr. Northington, intrinsic evidence has to go to one of the charges with which he's charged. But he was in charge with a predicate act for being involved in the firebox. In charge with RICO conspiracy. But then they delineate different predicate acts for each individual defendant with regard to that. Well, there are special factors that they wanted the jury to look at, but that doesn't mean, and you just heard Ms. Lynn make the argument, you can be involved in a RICO conspiracy, and there can be evidence of a RICO conspiracy, but it's not one of the special sentencing factors. And here, this is evidence that he's in a conspiracy for KSO, this organization, this hyper-violent drug organization. I mean, go directly to Judge Surik's ruling, which was, in the first instance, intrinsic evidence, and then as a backup, he says, and even if it weren't intrinsic, I think it was 404B appropriate. But clearly, if it's intrinsic evidence, under Green, there's no need to go to 404B. That's correct. No, if that's the finding that the court makes, you're absolutely correct. That's what the legal standard is. However, when the oral argument was made with regard to the admissibility of that evidence pretrial, that's not how the evidence panned out during the trial. And again, the objection was renewed that it still should not be coming into evidence. But the ruling was never revisited, never changed in any substantive way. So you're relying upon oral representations that are made. Well, this depends on us accepting your argument that they never linked it up, even though the assertion is made that MoneySign did this, and he's Dollar Bill, and therefore, and they hear Dollar Bill, they can make a connection. Judge, I understand everybody here will review the record again, I ask you to. I know you have a bevy of law clerks. They will look at it as well as assistants. But when you look at the actual facts as opposed to looking at the oral argument that was made on the motion, it didn't pan out the way the government said it was going to pan out and was undermined by how the evidence actually panned out. Is this harmless error? I suggest not, because if it would not – I should have said it differently, I'm sorry. Are we on harmless error review here with respect to this evidentiary ruling? Even if we thought this is an abuse of discretion, that evidence shouldn't have come in. There is a mountain of evidence against Mr. Northington in this case. If we're on harmless error review, how do you get past that? Sure, two different ways. First, I suggest to the court we review the record again. There was not a mountain of evidence against him. The only evidence against him in the Parker murder was from corrupt and polluted sources, which although it might have been direct evidence against him, doesn't necessarily make it a mountain of evidence against him. And the same with regards to Flowers murder. But if I may take a second – There's a mother who sees him fleeing the scene, right? Isn't Parker's mother – I mean, are you saying the victim's mother is a polluted source? She sees – They see the gunman, Lewis, fleeing the scene. No. She identifies Northington. Have I got that? Maybe I got it wrong. I thought her evidence was she sees Northington flee the scene and go into the apartment. Am I wrong about that? I do not recall that. Am I being wrong? I can stand corrected as well, but I do not recall that from the trial. I do not. I recall Lewis running away, and he was running away in a direction away from Northington's residence, which was part of my argument that Lewis wasn't linked to that. Wasn't there some disparity in the evidence at trial as to what street or what direction the person was running from? I remember that – my recollection – again, it's been a long time, and I didn't review all the factual record again, but my recollection was that Lewis, who admitted being the gunman, was running in the opposite direction of where Northington resided at that time. That's my recollection, because I made that part of the argument that he couldn't necessarily link Lewis and Northington because he didn't run to a place he could hide. He ran another direction. The affidavit says, The victim's mother was walking west on Luzerne Street, approaching 7th. She saw two men she knew as Toot and Steve, Steve being Mr. Northington, crouching behind a car. Steve was holding a gun. She hears gunshots, right? And then, quote, she saw Steve and Toot run into 3908 North Franklin Street. The victim's mother knows Northington, identifies him, sees him run to the residence. What's polluted about that? Northington was not the gunman, Judge. I know he wasn't the gunman. It doesn't matter. She recognizes him and sees him go. This piece of your argument started with, There's not a mountain of evidence. There's nothing to tie him to this marker murder, except for polluted evidence. We have the victim's mother identifying him and seeing him flee the scene and going to the apartment, which is ultimately searched, which unearths what I would characterize as, maybe not a mountain, but a pretty good-sized hill of evidence. A lot of stuff against your client. So, I'm back to harm of fear. Would you agree that we're on harmless error review with respect to the evidentiary ruling that lets in the circumstances of his arrest? You are. You are. But in terms of that one aspect, I know my red light's up. But I invite this court and urge this court again to read the closing argument of the prosecutor because it was a clear effort to link Northington directly to the bombing. It was not accidental when the pointing happened. But even look before that because you have to look at the context that I've laid out in very linear sequence in my brief. It wasn't a one-time event. There were three separate episodes where this came up where they're trying to say, Stephen Northington is involved in the firebombing. He's basically not charged with it, just in the way they even structured the closing argument. Okay. Thank you.  We'll hear from the government. Thank you, Your Honor. I'm going to please the court. Robert Zossmer on behalf of the government. I'll go in order unless the court has a different preference. Beginning with Mr. Berman's argument regarding the attorney conflict. There does have to be an actual conflict, and there was no conflict whatsoever. The idea was tossed out this morning that we don't know what happened. We know exactly what happened. The court had an evidentiary hearing, and Judge Sherrick made extensive factual findings, which begin at page 59 of the appendix submitted by Ms. Savage. Hit the timing aspect, which Mr. Berman makes a great deal. There's a lot of that in the briefing, and here's the podium again today. Is this justice delayed equal justice denied? If you're sitting, as he puts it, with the financial advisor who's stealing from you next to you, it doesn't matter that you've got an honest one next to you. Well, it's going to get back to my statement that there's no conflict here at all. But in terms of the timing, the judge took immediate action. The judge appointed separate counsel for the defendant, separate counsel for the attorney, gave them time to brief it. It turns out through no action of the judge that counsel for Ms. Savage, the new counsel, did not file the motion until after the evidence was concluded. I think for the sake of discussion that there were a much more clear and serious conflict than the one that's posed, assuming it were a conflict. Could you make the same argument that after the trial's good enough? Imagine the circumstance where it comes to light that Mr. Phillips actually prosecuted Cabani himself. He was on the team that handled it, and he was privy to all kinds of information because of that. Could you say, well, after trial's good enough? Who cares? No, not at all. I mean, the real point here is that the remedy and the result are going to be the same. But it's still, in response to Judge Jordan's question, it's still a case management issue, isn't it? Oh, absolutely. I mean, and Mr. Berman can address this when he comes back on rebuttal, but as I understand his position, what he really wanted Judge Surik to do was put the jury on ice for a period of time while he resolved this. Right. And that, to me, is a heavy lift, it seems, in a case of this size, what turned out to be this duration, and a big ask to make of a jury that would have to sit on ice during a period of time while this was resolved. Judge Surik decided not to do that. That's clearly a case management decision subject to our review as to his exercise of discretion, isn't it? Absolutely. I agree. I want to get back to Judge Jordan's question in a minute, but let me start with that, if I may. Yes, it's a case management issue. This court will always defer to the case management discretion of a trial judge, especially in a case like this where you're dealing with a capital case, a four-month trial, so much of the extra restrictions that go into this. And so, yes, the judge has clear discretion to act as he did. But the other important point that I want to make, in this case back to Judge Jordan's inquiry, is that it's going to turn out the same depending on whether there's a conflict, whether you do it during the trial or you do it later. If, as Your Honor says, there's an absolute conflict, of course there could be cases in which he prosecuted the guy, there's a clear conflict, then there's going to be a new trial. There may be a mistrial during the trial or there may be a new trial ordered after the trial. The result's going to be the same. It's all going to come back to the question of was there a conflict. Okay, and what's our standard for figuring that out? Because they cite Wood v. Georgia. They point to Note 18 where the court says, quote, Sullivan mandates a reversal when the court has failed to make an inquiry, even though it knows or reasonably should have known that particular conflict exists. That's their close quote. Their assertion is, I took it from their briefing, when I talk about abuse of discretion here, Kyler v. Sullivan mandates reversal. What's the response? The answer is there does have to be a hearing. There was a hearing. The timing of the hearing, as I said in response to Judge Smith's question, is within the discretion of the judge, and that hearing produced a result that there was no actual conflict, which, of course, this court would have to find. If I could just quote one statement by the district judge, this is page 68 of Ms. Savage's appendix. In one of Judge Sterk's characteristically very long and detailed opinions, he wrote, Phillips, named the attorney, Attorney Phillips, was assigned the case for a total of nine days. During that time, he reviewed no discovery, interviewed no witnesses, made no court appearances, filed no motions, and did not discuss the case with anyone. He took no action on the file whatsoever. His role was so minor that he did not even recall being assigned the file. The defense would have to say that that's clearly erroneous. Those are findings of fact. Those are findings of fact. And they have not said that those are clearly erroneous findings, nor could they, because it's consistent with the state's record, it's consistent with Phillips' testimony, who the district court found credible. He made no appearance in court and spoke to no witnesses. All he did was he got this memo saying, you're assigned to it. He wrote down in his handwriting on that memo the date of the Savage trial that was scheduled, and that's it. He never did anything else. With all respect, this is not a serious issue. Well, they thought it was. But setting that aside, why don't you turn to the assertion that there was no fair basis for allowing in the statements, the jailhouse recordings, in a way that could be argued to have been admitted against the co-defendants, and in particular, Ms. Savage argues these were admitted as co-conspirator statements against her. Is that an accurate statement? Does the record support it? When I went back and read the transcript, it sure looked like they were arguing for them to be treated as co-conspirator statements. If that's true, do we have a serious evidence or a problem? So it's interesting. I'll give a detailed answer. But the short answer is, yes, some statements were admitted as co-conspirator statements against Ms. Savage, but they were so insignificant in the scheme of things that nobody talked about them at all. It wasn't a significant— Well, some of them actually involved Ms. Savage. Absolutely. She was a participant. Oh, absolutely. So, yes, at the outset, the prosecutor says these are admissible as co-conspirator statements, and they are. She is charged with being involved in a conspiracy to murder people, which is part of a conspiracy, to intimidate a witness. Yes, but there's more than that going on here, and it doesn't just have to be a statement of a co-conspirator. It's got to be in furtherance of a conspiracy. And they make a pretty darn good pitch that if way after the fact you're bragging to people in the cell next door, I fried those little kids. You know, it's horrifying things to say, but it can't possibly be in furtherance of a conspiracy because the people in the cell next door have nothing to do with the conspiracy, and the act is done with respect to that. So it can't be in furtherance of. Are you making the pitch that every time somebody's bragging in jail, their statements are in furtherance of a conspiracy of things that have already happened outside? No, not at all. How does it have any other privileges, though? The important thing, there's a raft of statements by Mr. Savage. Some of them are in furtherance of the ongoing conspiracy to intimidate witnesses, where he is assuring people, including people involved in his conspiracy, like Mr. Bay, he is assuring them that he is going to continue to attack witnesses, which is what they did with the Coleman family. So those statements are in furtherance. You're right. There are other statements where he's bragging to anybody in sight that may not be in furtherance of the conspiracy. So what does this come down to? This is a trial issue. This is not an issue for the jury instructions. The trial judge did what he would— That surprised me to hear you say that because I thought your argument, in fact, it occurred to me, it was maybe your best argument, was whatever problem there was was handled by the jury instructions. The judge told them, don't worry about those statements, about these horrifying things that got said, because they're only to tell you about the state of mind of the person saying it. Correct. And that instruction actually was more than the defense was entitled to because the instruction actually limited the jury's consideration to the state of mind of the speaker. And what I'm suggesting to the court is it could have gone further. The court also gave the appropriate co-conspirator statement instruction, telling the jury if it's in furtherance, if it's during the conspiracy, you can consider it against the conspirator. If the jury had wanted to do that with regard to the statements I'm talking about involving Ms. Savage, it could have done it. But here's the important point. The argument that's made to the court this morning is that, no, the court had to go further. It had to tell the jury, don't consider co-conspirator statements against Ms. Savage. And, in fact, they say, here's a list of 60 statements that the judge should have told the jury, don't consider. That would have been wildly inappropriate. It would be wildly inappropriate to say what they did say at the time, which is, Your Honor, these things shouldn't come in against my client. These things being jail hours. I mean, I guess what I'm asking is, is it incumbent on a trial judge to, if it's going to let some things in as co-conspirator statements against everybody, and it's not going to let other things in as statements against certain parties, but it's going to limit it, that when the statements are coming in, there's some responsibility to say, these are co-conspirator statements. These hit everybody. They're in furtherance. It's up to you to decide whether they're in furtherance of the conspiracy and to decide whether they're co-conspirator statements. These other things, I'm limiting you on. In other words, not wait a month to tell them that. That's the argument they're making to us. Sure. And the answer is there is no responsibility, especially where no specific request is being made. In the normal case, say the government puts forward ten statements that it says are co-conspirator statements, and the jury has to decide, are they during the conspiracy, are they in furtherance? Say eight of them, it turns out, when this court scrutinizes it. Say eight of them are. The judge doesn't have any responsibility as the trial is happening to himself tell the jury, you know what, nine and ten, those aren't co-conspirator statements. One through eight. That's taking the function of the jury. And, in fact, the defense. Well, taking the function of the defense counsel. I mean, it sounds like what you're arguing is the blanket request they made to keep these out was insufficient. It was up to them to make objection statement by statement. Correct. There are two things they could have done. They could have made it. If one particularly irrelevant statement came in, they could have asked for instruction. They never did with regard to any particular statement. But the other thing that they could do, if they're so concerned about these 60 statements, is address it themselves in closing. That's the whole point. The judge circuit. That's not the same thing, though, as asking a judge and having the imprimatur of the judge declare to find true facts. Right. But I think we have to distinguish, Your Honor, between statements that are clearly not admissible as co-conspirator statements and statements that are arguably admissible, but where a jury has to make a factual decision as to whether it was during an infurbiance. And most of these fall into that second category. So that's where it is defense counsel's job. And, by the way, Judge Sirk put no limit on closing arguments in this case. She could have stood there all day long and gone through these and explained why they shouldn't be held against Ms. Savage. That leads to my last and, I think, very important point. The reason she didn't do that is because these statements don't matter in the case against Ms. Savage. Any reasonable person hearing this case knows, sure, those statements are important to the extent that Kiboney Savage is admitting that he was involved in these murders, and then you connect that to the fact that Kiboney's on the phone with Kedada and they're arranging all this. Yes, it's relevant to that extent. But the whole bulk of it otherwise is, as Judge Sirk instructed the jury, relevant to Kiboney's state of mind. The reason that the defense counsel didn't mention a single one of these calls during the closing is because everyone knew that that's not what the prosecution was about. And, in fact, the government never mentioned any of these calls in its closing with regard to any of the defendants other than Kiboney Savage. So this is a factual issue, it's for the jury, and it wasn't that significant, which is why nobody argued it to the jury. But you say it wasn't that significant. The government went out of its way to play these statements because they were significant. Oh, they were very significant regarding Kiboney Savage. This kind of glides over their arguments about how do you keep this from bleeding into everybody else. These are genuinely horrifying. I mean, I've been doing this for a number of years, and I don't remember seeing something quite like this where a guy is exulting in the death and the terrible, painful, one can only imagine the horrific circumstances of these deaths. And it is, you know, words practically fail you to think how bad this is and how thoroughly he seems to be enjoying it. I mean, if there were anything calculated to make a jury hate somebody, it's these statements. And they're out there floating against, they say, on the other side, everybody. It's like the famous New Yorker cartoon where the jury is aghast and falling out of the jury box as the judge says, disregard that last remark. How do you do it? How do you do it? I haven't seen that cartoon, but it sounds like I should. Well, how do you do it? I mean, that's the argument that's being made to us is this was so bad, the jury couldn't possibly compartmentalize it. And that kind of takes us, let me segue into the severance arguments that we're getting from Mr. Northington and Ms. Savage here. Right, that's the severance argument, and the authority on that is very clear, that where a jury is able to compartmentalize, and I'll talk about that in a second, that severance does not happen. It's a discretionary decision of the judge. This court has always deferred to that. I don't know of a precedent in which this court has reversed a severance ruling or severance denial by a district judge. There have been cases involving murders. Euphrasio is actually a more extreme case than this because in Euphrasio, one of the defendants was charged with murder, and the two people who were seeking severance were not charged with any murder at all. That's not this case. Cadavis Savage is charged with the six murders. So is Merritt. Northington is charged with two murders. But can the jury compartmentalize, and the district judge did not abuse its discretion in saying that it could, and its faith was confirmed because we see that in the verdict. Could I just follow up not only what you're saying but on Judge Jordan's question, and I'm not being an advocate for the government here. I'd be interested in hearing on rebuttal if any of counsel want to address this. But Judge Jordan, I think, very accurately and fairly characterized, egregious is hardly the word, the awful nature of so much of what was said. I was a prosecutor. I was a state prosecutor. I walked around homicide scenes. I've walked through brain tissue and blood and gone to autopsies and remember stuff I wish I didn't remember. This is as bad as it gets. But Judge Jordan in his question used if ever there's stuff that would make a jury hate someone. Is it the response to that, who's the someone they're going to hate and who are they going to focus on? And I'd like to hear you, but perhaps even more so, counsel respond to that. With the instructions, they are asked to, told to compartmentalize, and if we assume that a jury follows the instructions and if the aggravated, terrible nature of these statements are what they are, isn't the jury going to be focused on Mr. Savage? Well, that's exactly right. And what it reminds me of is what this court has said a number of times and the Supreme Court has said is that joint trials are not just favored by our system, but they often work to the benefit of co-defendants because it puts people's relative culpability in perspective. And I think we saw exactly that here. I'm going to talk about it again when I get to the Merritt issue involving the Apprendi issue. This jury carefully calibrated their verdict. This jury compartmentalized. They knew exactly what they were doing. In acquitting him of the substance of murder charges, I'll get back to that later, they found some of the sentencing factors not proven as to Merritt and Northington and Cadata Savage. Northington, they spared his life. They spared Merritt's life, probably, by finding him not guilty of the substance of murder charges. They then literally spared Northington's life by returning a life sentence instead of a death sentence. There's no question that this jury knew who was who and, of course, sentenced Ms. Caboney Savage to death as this court has affirmed. There is no question that Caboney Savage painted himself and he was the focus of this horrible evidence. So how long the deliberations were in this case? Excuse me? The deliberations, how long were they? They were long. If I could ask my colleague, Mr. Troyer, who was there, he can answer that in a moment if he can remember nine years ago. They were lengthy and the deliberations were also somewhat lengthy on the capital case. When they then came, you know, there were two capital proceedings, one for separately for Mr. Northington and Mr. Savage and they deliberated at length regarding both of those as well. Why don't you do, in fact, turn to the Apprendi argument from Mr. Merritt and I would be very interested to have you address how it is that he can be acquitted of the sentencing factor, which one is it? Number 15, witness retaliation resulting in Coleman family murders not proven and not proven or not guilty with respect to every one of the murder in aid of racketeering. They say it's not murder in aid of racketeering. So if they say it's not murder in aid of racketeering, they say it's not witness retaliation as part of the KSO process. Where is Ms. Lynn wrong when she says there's just a disconnect? He did do the murders. They said he did the murders. It wasn't a conspiracy, but there's nothing to link them. So there's the easy answer, Your Honor, and then the more precise answer. The easy answer is the rule, which I think I just violated about a minute ago, that we're not supposed to look at the actual jury result, that we don't look at inconsistent verdicts if these verdicts were inconsistent. We only look at whether the evidence supported the decision of the Supreme Court. We only look at whether the evidence supported the verdict that was made. That's the easy answer. But here's the more precise answer. This jury knew exactly what it was doing because the substantive charge of murder in aid of racketeering requires proof that the person committed the murder, but also did it for the purpose of increasing or maintaining his standing in the legal organization. This is not just a murder charge. This is a violent crime in aid of racketeering under Section 1958. And there's a very good argument to be made, and it apparently swayed the jury, that Mr. Merritt did not do this. He didn't have any standing in the legal organization. He had been a drug seller for his cousin, Lamont Lewis. Lewis calls him and says, let's go do these murders, and he does them to further Lewis's participation in the conspiracy. Well, then that actually takes you into the argument that there's an inconsistent, not an inconsistent, but there's in effect a constructive amendment of the indictment that if he's got, quote, no standing, unquote, as you just put it, in the RICO organization, isn't that a problem? He got charged with that. And then their argument is, yeah, you changed your tune of trial, government, and said, well, he doesn't have to be. But that's an amendment, constructive amendment. So not only did we not change our tune, but this shows exactly why we were singing the tune we were singing. He is charged with conspiracy. He is not charged with participation in a RICO organization, except in those VICAR counts that he's acquitted of. The conspiracy is to violate RICO. There's no constructive amendment, because we allege that people had an agreement to create an enterprise and that they took steps in furtherance of it, and Merritt did exactly that. He aided and joined the conspiracy when he agreed to help in these murders. It's not necessary to prove, and the judge precisely instructed the jury using this court's model and structure, it's not required to prove that he joined the organization or the organization was ever even formed. What has to be charged is that there was an agreement to take racketeering acts and that he knowingly assisted the conspiracy, which of course he did by committing these murders as he did. Okay, where's the link between the murders and the conspiracy? Well, I mean, there is no other way to look at this case other than that these six people tragically are murdered because they're the family members of the- There is another way. They've argued it, which is, this is little Bobby Merritt, younger cousin to the bad Mr. Lewis, who gets asked, hey, remember when we firebombed that empty building? Let's go firebomb another place. Sure. That's the pitch they make. That was, you know, he didn't know anybody was in there, didn't know what he was doing, just following his cousin. He's a bad actor, but he's not a cold-blooded killer that doesn't deserve a life sentence. This is all disconnected. Take it on, straight on. What's very important here, first of all, the jury rejected that, but what's very important is this is on plain error review. So there has to be an error that's plain. This, as the court has pointed out, the verdict sheet says to, you found him guilty as to the conspiracy. Now tell us, did he commit the murders? The judge instructs them, here are questions I need you to answer with regard to the conspiracy. He doesn't use the words based on, but is this error plain? I don't think one can say that. But even if so, we then get, and this is your honors question, we then get to the third and fourth prongs of plain error review. The third prong is, because it's plain error review, the burden is on the defendant to show that there's a reasonable probability that the jury would have reached a different verdict if it had been told the words based on. And so they have to show a reasonable probability of that theory, that I'm just hanging out with Lewis, throwing a can of gasoline into a house, having nothing to do with Lewis's drug trafficking activities and his association with Savage and that conspiracy. You can't meet that reasonable probability burden. And then you get to the fourth prong, which I think Judge Smith has touched on. This is the Cotton case. The Cotton in the Supreme Court says where the evidence is overwhelming, then it would not just not meet the public need to correct the error, it would offend the public interest in justice, not to give the appropriate sentence. That's the language of Justice Rehnquist in Cotton. Here, it actually goes beyond Cotton. In Cotton, you have no jury finding at all as to whether you have the drug quantity that will allow the life sentence. Here, you literally have a jury verdict that Robert Merrick committed six murders. And the only question we're left with is, was it connected to the conspiracy? It would offend that fourth prong of plain error review to absolve him of the life sentence for those murders based on what's been asserted here. Just to touch on the other things that have come up, if I may, with regard to Mr. Northington and the arrest, the argument, as I understand it from my friend Mr. Egan, is that it was never linked up that Northington, the reason he's got a full can of gasoline and a firearm and latex clothes in his car, that it was never linked up that that might be part of the plot against the Coleman family. It was linked up. The call that takes place in June is where Caboni tells Cadaga Savage to tell MoneySign to get on that, to get it done. The government did argue at trial. That's the only reference to the term MoneySign anywhere in the case. But what is prevalent in the case is when they're having these recorded conversations, they're often using coded and cryptic language, and that's why Caboni, everybody knows that Steve Northington is Dollar Bill, he refers to him as MoneySign on the call. Let me just say, everybody knows that. That's their argument is, no, everybody doesn't know that, and you didn't link it up. Let me just say, it did come out that Dollar Bill was his nickname. Everybody knows that, what I'm trying to say, I'm sorry if I misspoke, everyone knows that Steve Northington is Dollar Bill. So the question is, is that... They know it because it's in the record. It's in the record, many witnesses testified to it. But witnesses also linked up that MoneySign must refer to Dollar Bill because there's no other logic to it. If you look at page 350 of our brief, we cite a bunch of citations to the record of where this specific issue was discussed. So I part company with Mr. Egan on this. Where somebody on the stand said MoneySign is Dollar Bill. Yes, the agent said it, for one thing, and that's cited in our brief. And the government argued it. And then it's up to the jury. The jury can decide. And, of course, there was... So then we get to all the other evidence involving Mr. Northington, and that, of course, includes what was taken in this house. On the suppression motion, I'd like to correct a mistake that was made in our brief. It's actually probably the only mistake that appears in any of Judge Starrick's opinions, and maybe we're responsible for that too, in talking about what was left out of the affidavit. The suppression argument, the Franks argument that was made here, is that an affidavit is submitted by the police to search Mr. Northington's house. And the alleged misstatement in the affidavit that we addressed was the notion that the shooter, who was Mr. Lewis, had run down Franklin Street, when, in fact, the witness said that the shooter had run down Luzerne Street. And so we said in our brief, and Judge Starrick said this also, all right, that was a mistake to say in the affidavit that the shooter ran down Franklin Street. The fact is, that's not in the affidavit at all, and that's where we made an error. If you look at the affidavit, which is very short, it's page 145 of the government supplemental appendix, and I looked at it again this week and saw this mistake. All the affidavit says is that the witness fled down Franklin Street. The affidavit says nothing about where the shooter went. So what we're dealing with here is not a misstatement in the affidavit. We're just dealing with an omission. The affidavit omits everything about the shooter. As we point out in our brief, had the affidavit included what the witness said about the shooter, it actually would have added to probable cause, because what the witness says that the detective, for whatever reason, didn't put in the affidavit, is that the shooter, first of all, the witness sees Northington's car. He knows Northington. He sees Northington circling the block. The witness says that Northington had a beef with Parker, the murder victim, and he says he sees the shooter run in the direction of Northington's car. So they obviously would actually bolster probable cause when the mother then sees Northington run into the house. So with that correction, I don't think there's any issue with regard to the suppression issue. As far as pointing at Northington and closing, that was immediately corrected by the prosecutor and by the court. The very last thing I'll say, apart from questions from the court, one other bit of housekeeping is we had said that there were eight issues that were still left for these three appellants. There are actually nine, and you may have noticed this, or I'm sure one of your sharp-eyed clerks did, and that's the Batson issue. This court, in its opinion regarding Keboney Savage, addressed his objection to one of the – Batson's objections to one of the jurors. Mr. Northington, in his brief, challenged another juror that Savage didn't join, and it's juror 384. So that's a live issue that hasn't been resolved yet by this court. We've addressed it in our brief. There were lots of race-neutral reasons to object to juror 384. I can go over it if the court wants, but I just want to make clear that that issue's still out there. Thank you. Thank you. All right. Appreciate your argument, Mr. Sosmer. We'll go ahead and take this in the same order we heard the beginning arguments, the opening arguments. Mr. Berman. Thank you, Your Honor. Just very quickly, I think it's one point, two quick points. So on the conflict issue, Judge Smith made a very fair point, that it's a big ask to have a district court judge stop a trial like this one in the middle to inquire. And my response to that is that it is a big ask, but that the Sixth Amendment is a big right, and I would just ask the court to go back and look at page 42 and 43 of our original brief. I'm sure it's in our reply brief as well. And that's what the case law requires. And just to circle back to a question that Judge Jordan asked, or all of your honors asked, about pointing to a specific thing where it affected counsel's behavior. Well, there's a specific thing, which is counsel should have insisted that the issue be fleshed out immediately if he was advocating for his client. And I'll just relate. I've been handling criminal cases for almost 30 years now, and this goes to Your Honor's point about every time a defendant raises a conflict. A defendant never raises a conflict. It's usually a lawyer or the court that notes the conflict. It's happened twice in my career. And so I can experience what Mr. Phillips was feeling. First of all, there's a financial incentive to continue in a case. Second of all, it's embarrassing. In one instance, I had made a mistake, and I had alerted the judge and said, I've made a mistake here. You need to point to another lawyer who's not conflicted. And the second one was in front of Judge McNulty, where I found out that my partner, who advised the defendant, I belatedly found out he advised the defendant, and it seemed to me that there might be a conflict there. And it was embarrassing for me to go to Judge McNulty, my former law partner, and say, listen, I've got a problem here. I've got a conflict. That's how a defense attorney who's zealously advocating their client handles an issue when it arises. That's not what Mr. Phillips did. So in addition to the fact that the district court, I've submitted, should have addressed this issue immediately, notwithstanding that it was a big and complex trial, defense counsel also did not do what was right by his client, and that's the obligation under the Sixth Amendment, to zealously represent your client's interests. With respect to the evidentiary issue, I heard Mr. Zosmer say that a judge is not required to tell a jury, don't consider certain evidence. Well, I guess that's right in so many words, but judges are required to give limiting instructions when they're appropriate, and those requests were made. We cited on page 57 of our brief two instances where he made requests in response to that evidence, and the judge didn't do it. And what's interesting is that I didn't talk about the severance issue, which we raised as well, but in denying Ms. Savage's motion for a severance where the evidentiary problem was foreseen and raised, one thing Judge Surik said in his opinion, and it's in our appendix, is I think the court can give an appropriate limiting instruction. And when the moment came, the judge did not give an appropriate limiting instruction, and that ended up prejudicing Ms. Savage because of the significance of that evidence. What's different about Ms. Savage is her relationship to Kabbani Savage. They were siblings. That was stressed by the government at trial, that connection. And so those statements were just as prejudicial against Kaddada Savage as against Kabbani. If it weren't, then the government would not have objected to the limiting instruction because they wouldn't have cared. They did care. They wanted the jury to consider that evidence against Ms. Savage, and it did, and inappropriately so. Okay. Thank you, Mr. Berman. Ms. Lynn. Thank you. I just want to point to one point in the government's closing argument with regards to Mr. Merritt's joining of this conspiracy. At A14141, the government says that he may have been more on the periphery, but, folks, he also knew the purpose of the conspiracy, and by selling drugs under the protection of Lamont Lewis, he, Mr. Merritt, too, became a member of the conspiracy. The government itself is arguing that Mr. Merritt's participation in this conspiracy was based on drug selling. Now, with regards to the – Got it. I'm not sure how that helps you, though. Well, because for the special factor to apply, the RICO conspiracy conviction has to be based on the murder, not necessarily on drug selling. The RICO conspiracy has to be based on the murder? Did I just hear that right? The RICO conspiracy has to be for the special factor to apply to Mr. Merritt. The enhancement to apply to Mr. Merritt. The jury has to find that his RICO conspiracy conviction was based on his participation in the murder and not based on his participation in drug selling. Okay. Yes. Sorry. That I understand. Go ahead. I probably misspoke first time. I apologize for that. With regards to the third and fourth prong of plain error review, the reasonable probability, whether or not Cotton applies, I just point to the acquittals in this case. It shows there was a reasonable probability that the jury did not believe that Mr. Merritt... Or does it show just as much that the jury understood there's some things he's not guilty of, but there's some things he is guilty of, and he's guilty of murder in pursuance of the conspiracy. But they never found the in pursuance of the conspiracy. Okay. Understood. Thanks. Mr. Egan. Just a panelist question. I'm finished. Okay. I don't believe so. Any questions? Your Honor, if I could add one fact on Judge Poynter's question. The jury deliberations, they went out on Tuesday, May 7th, and returned a verdict on Monday, May 13th. So it was basically five days of deliberations on the guilt day. All right. Thank you, Mr. Hatcher. Judge Jordan, if I could just make one comment, and that is that during a substantial period of time while I was serving as counsel, I was involved in a number of cases that included COVID and all related to COVID. And during that period of time, we did not see notwithstanding various court listings and other events, Mr. Zosmer. I asked a number of his colleagues about him during that period of time, and I thought that perhaps he was in a Cheney-like undisclosed location somewhere, but found out that he was in fact okay. So it is good to see him after several years and a period of time during which he was absent from proceedings to which he was invited. Yep. He was in the Virgin Islands. Yeah. We're grateful to all counsel for your argument here today. It's been helpful. This was the briefing. Thanks so much. We'll go ahead and recess court.